May it please the Court, I would like to reserve five minutes for rebuttal. So before you start the clock, we had this issue yesterday. Fifteen minutes is listed. So that is your time. Obviously monitor your time and if you want to reserve, reserve. We had a counsel yesterday who thought that had already deducted the five minutes. So just so we're clear about that. So go ahead. Thank you for the very useful warning. You got it. Appreciate it. This case is an instance of unrefuted sexual harassment. Normally sexual harassment cases, as all of your honors know, tend to be things like he said she said situations. This is a she said situation for the factual record and then she recorded it. The facts in the record are the victim's sworn deposition and declarations, the audio recording that she has of sexual harassment where her harasser told her that he wanted to come inside her and make her come too. I apologize for the vulgarity of the language. And then there is also a surveillance video that defendant Sealy had at one point recording the harassment that they lost or destroyed that was not reviewed by their HR during the investigation and surrounding the complaint despite the plaintiff requesting that HR review that video. Now how we got here to refute the claims of plaintiff Jamie Elwood, Sealy presented an empty chair. They did not call Alfredo Perez the harasser to testify, to give a deposition, to give a declaration. Instead Sealy just told us what Perez might have said and might have meant and what his motives might have been. Now the district court viewed those claims from an empty chair as fact and that is how we ended up with a summary judgment. For example, the district court addressed the quid pro quo claim. There were two instances of Perez the supervisor offering or demanding sex from the plaintiff in exchange for an invitation to a trip tied to a promotion. It was a supervisor trip. Plaintiff would not normally be allowed to attend that. If she shared a hotel room with Perez, he was going to get her invited. That was it. I'm sorry. I guess the question on that one, at least looking at the summary judgment, is that we have Perez who's inviting her on the trip and saying he can get her onto the trip. But then the question is, did he have that authority? Where does he run in the chain of supervisory command? Thank you, Your Honor. That's an excellent question and clarification for me to make. We're dealing with either actual or apparent authority. And Your Honor has touched upon, which the district court did as well, the actual authority element. Now I would argue that the district court erred in that because actual authority doesn't mean the signature that is signed on the promotion papers. It means who has actual authority to make that happen. Now Perez was the sole supervisor for plaintiff. He was the only one that was directly observing her. He was the only one that could have told management, yes, she is good for promotion or no, she's not. But the great part for plaintiff is we don't even need to get there because we can rely on apparent authority. The Smith v. Hansen, Hansen and Johnson case explains apparent authority. It says apparent authority can be created by appointing a person to a position which carries with it generally recognized duties regardless of unknown limitations which are imposed upon the particular agent. That's what we have here. It's easy for Seeley now to look and say, here's the chain of command. Let me explain it to the court. The issue is the plaintiff was in a position where she had a sole supervisor who was telling her I can get you the promotion. I am grooming you for this promotion. I am going to get you an invitation to this supervisor event. How do you respond to their concern that she didn't report right away? Excellent question. So the issue that only comes into play, and that is only material to this case, if we adopt the federal defense, the Ferarger-Ellert defense, and I'm just going to call it a federal defense or I'm going to stumble over those words every single time. Fine. I don't know how to spell it either. Thank you, Your Honor. We only reach that as a material fact if we get to the defense. The quid pro quo claim, that defense would not apply even in federal court. Her hostile work environment claim, it does not apply as long as there is a tangible work event. Here, it's a denial of a promotion. I'm happy to return to that in a moment. But to answer your question instead of avoiding it, there's a two-prong requirement. The second prong is that. The first prong, Seeley would have to prove that they acted reasonably. As we've briefed extensively, and I can come back to that, we do not believe that they acted reasonably. There's certainly a factual dispute there, in our view, because he was not monitored. Because the same quid pro quo behavior he had done once before that Seeley looked over happened again. A variety of issues there why they can't satisfy the first prong. Can you help me with the timeline there? So the first investigation is about five months prior to her complaint, is that, or ended about five months prior to it? Yes, Your Honor. So on- Then how many weeks did she work there? Sure. She had been working there for a good amount of time and had a prior supervisor, which she had no issues with. The initial complaints against Perez were ended around March 2021. Now defendant and the district court relied on this idea that Richard Coteney, one of the managers, was observing and monitoring Perez during this whole period. So that made it reasonable what they did. In fact, that is not what the factual record says by Coteney's own representations. In his own representations, Richard Coteney said he was monitoring Perez for his mistreatment of women in March 2021, and that got resolved in March 2021. That is his signed declaration. So he stopped monitoring Perez in March 2021. Fast forward to end of September 2021, that's when Perez started to supervise Jamie Elwood. So there was no monitoring between March 21st to September 21st, and no monitoring, to get back to your question, from September 21st through November 2021, which is when Perez was the supervisor for Jamie Elwood. Was Holiday the same HR person in the March 21st era, with the first incident? Yes, she was. And there was, just to refresh the court's memory, there was a quid pro quo complaint filed against Perez then, very, very similar MO. One of the female subordinates said, I would like to come into work earlier, I'm more effective in the morning. And he said, come in a few hours on Sunday, I think it was, come in on your back and we'll get you the better hours. That was reported. During the investigation, multiple subordinates said that he, Perez, inappropriately or unnecessarily touched them, made innuendos and comments, et cetera. Again, same MO. Seeley ultimately said, well, you call some of your subordinates babe and baby, and you shouldn't do that. And that was the end of the investigation. Towards the end of the investigation, the original quid pro quo victim, who had said he wanted me to come in on my back for better hours, went back to Seeley and said, hey, he's retaliating against me. He's suddenly very mean to me. He gave me different job duties that are less favorable, that I'm not good at. Help me. And Seeley listened to her and then did nothing. Didn't admonish Perez, didn't say, hey, you can't retaliate. Didn't require additional training from him. None of that. I want to ask about the reporting on the hustle work environment, because it did seem contemporaneous to me. But then I realized Seeley has a fairly restrictive policy. So my notes suggest that there was claimed harassment on the 15th, the 17th and the 18th of November. And she reported on the 19th. And does that somehow disqualify her reporting? Because it's within three days of the first reporting and then four days of the first, the second incident. Until I read the district court's decision, I would have said no. Right. I did not. That's what I'm trying to understand. I did not think the timeline, it was a matter of a few days from the overt, and I won't It was only a matter of days that she, quote unquote, delayed. And she delayed because she did not believe that Seeley would believe her. She didn't want it to be a he said, she said situation. That is what happened the last time with a prior investigation. Full disclosure, she was not aware of that investigation directly at the time, although she was part of the culture and community of Seeley where people talk. Jamie had a firm belief that Seeley would not believe her based upon the culture at  But to go. You're basically your bottom line, as I understand it, is factual issues on both quid pro quo and hostile work environment. Yes, Your Honor. Even if we apply the federal defense. I like that shorthand. The the district court. The district court ruled against plaintiff summary judgment motion based upon facts and I'll use air quotes that they won't be able to see in recordings based upon facts that Seeley presented from the empty chair. They could have called Perez. I don't know what he would say. I don't know that they know what he would have said. He might have said, I look back. I was a terrible person. And during that time, I did try to have sex with her in exchange for a promotion. That is what is the record says. That is all we have. That is what we have from Jamie and sworn declarations, depositions. She is the only person that was available or the only person involved here that has provided evidence, actual evidence, sworn statements, facts. We don't know what Perez said. And the major error that the district court made, yes, is a factual one. And it is giving that empty chair some sort of factual relevance in the case. Seeley could have called Perez to testify. They chose not to. I don't know why that was their choice, but they cannot now speculate facts as to what Perez would have said or what he meant or what his motives were. All we have is Jamie Elwood's account. And I ask about the spoliation issue. Did you counter sue or counter claim for spoliation on holidays notes that she didn't ever have those notes, right, from the interview, the first reporting interview? We did not, Your Honor. We had a potential spoliation issue both for the investigation notes, as you said, from both investigations. Those were destroyed without explanation. We just know that best practices for HR is that you keep those. There were also videos that our client requested HR to watch. Those disappeared. I don't know if those were lost or destroyed. We didn't file anything because our intent the entire time and according to the rules of civil procedure, you want to favor resolution on the merits. As the district court correctly found in this regard, neither party was prejudiced. There was no question of whether there was sexual harassment. The case could go on, as you might say. And so we did not want to further delay or increase expense in the litigation to argue over something that we would have liked to have, but wasn't needed to resolve. Well, certainly it would have corroborated her if those, according to her, it would have corroborated her, right? Those videos that she complained or she asked Holiday to watch, right? Yes, Your Honor. And because she's the only person that testified that was there because Perez was not called to testify, she's unrefuted anyways. So the videos would have been great and I'm sure would have resonance for a jury when he's touching her and being incredibly creepy for lack of better terms. But that wasn't something we needed to litigate the case on the merits. And did the co-worker Arianna Zanabria, did she testify at all? Because she's the one that your client went to and cried right before she reported? Yes, a gentleman, but yes. After she went to HR to make her complaint, he unbidden went to HR and said, this is not right what you did and told HR that. And afterwards he resigned, he quit Sealy because he was so disgusted with how Sealy handled this. I will leave it at that for my rebuttal. We'll round up to three. Thank you, Your Honor. May it please the court. I'd like to talk now about the actual evidence in the case. Plaintiff's quid pro quo claim fails because there's no evidence of any quid pro quo. Plaintiff's entire argument throughout this litigation has been predicated on the repeated claim that Mr. Perez offered plaintiff some kind of stepping stone to promotion in exchange for her having sex with him. But there's no evidence that the trip ever had anything to do with promotion or that plaintiff believed that it did. Wasn't it just for supervisors? It was just for supervisors. As regards to the trip itself. And she wasn't a supervisor? She was not a supervisor, no. But she could, that would be a promotion for her, right? Well, no, that would not be a promotion. It would just be an opportunity to go on a trip that she wouldn't otherwise be. Oh, but being a supervisor? Being a supervisor, sure, would have been a promotion, yes. But there's no evidence that the trip had anything to do with getting a promotion or even that plaintiff thought it did. And as regards the trip itself, it might be that Perez did hope that being on an out-of-town work trip with plaintiff would lead to her having sex with him. But there's no evidence that he ever made the trip contingent on her having sex with him or that plaintiff thought that it did. In fact, the undisputed evidence shows the trip was not contingent on sex and that plaintiff knew that it was not. First, plaintiff admits that Perez mentioned the trip weeks before he ever brought up having sex and then he brought it up again even after she angrily refused his sexual advances. That's ER 51 and 80. And at ER 51 and 74, plaintiff admits three more things. She knew Perez had to ask permission of his bosses for her to even go on the trip. She knew those bosses had to ask somebody else for permission for her to go on the trip. And she admits that Perez and his bosses had already done that and were waiting on approval. That shows two things. Plaintiff knew that Perez didn't have the authority to deliver this work trip and she knew that Perez had already done whatever it was he could do to get her on the work trip despite the fact she never had sex with him. So in other words, the work trip was never quid pro quo for her agreement to have sex. Now, hostile environment law strikes a balance of responsibilities between employees and  By imposing on the employer liability for a supervisor's harassment, but only if that reaches the level of severe or pervasive conduct. And by including an affirmative defense that allows the employer the opportunity. It's designed to allow the employer the opportunity to intervene and to stop the harassment from ever reaching a level of being severe or pervasive. And it does that by imposing on the employee the responsibility, the duty to report misconduct when it occurs and to avoid more misconduct. But plaintiff deprived Seeley of the opportunity to intercede early and to stop the harassment earlier, because instead of reporting Mr. Perez's first sexual comments on November 15th and his touching of her arm, instead of doing that, instead of deliberately avoiding to trying to avoid more misconduct, she made the deliberate choice to risk more misconduct in order to try to record it. And then even after she succeeded in getting a recording of sexual comments, she still did not report it. She made again the deliberate choice to expose herself to more misconduct. Now, all this conduct added up together doesn't reach the level of severe or pervasive. But even if it did, it certainly did not as of November 15th, when she should have and could have reported it and stopped it. The employee's role is not to gather evidence of more misconduct, but to report it and to avoid more of it. In the words... If she was concerned that she wouldn't be believed, such as when she showed her arm to Ms. Holliday and Ms. Holliday didn't want to look at it, and she said, look at these videos, and Ms. Holliday didn't gather them, and when she complained at that point, she didn't have very much of a, shall we say, compassionate listener to her complaint. I think that that is... It's true that she testified that she was concerned that she would not be believed. But it's also the case that there's a string of cases that we cite in our brief that says that fear that you won't be believed, speculation that you won't be believed, that you'll be retaliated against, none of that excuses the employee's duty and role as designed by the Supreme Court in Farrer and Eller. Her job is to report it and give Seeley the opportunity to stop it. And here... Isn't there a little bit of a contradiction here? Because you're arguing to us, well look, these events, 15, 17, 18, 19, whatever, are really not all that serious in terms of a hostile work environment, and they don't rise to the level. And then you're turning around and say, even the very first incident should have been immediately reported. So, she did what many victims would do, is to feel like, I'm not going to report this, they're not going to believe me. But you're also arguing it doesn't matter anyway because none of this is sufficient to rise to the level of a hostile work environment. Do I have that right? I am arguing both, but I don't think that there's any contradiction there. The Supreme Court designed this test so that when an employee experienced harassment, they had a duty to go and report it for the very purpose of preventing it from ever rising to the level of severe or pervasive harassment. And in the words of the Farrer court, the plaintiff should not be rewarded with the cause of action, quote, for what her own efforts could have avoided. Well, how do you get a hostile work environment out of one incident? Well, it would have to be a more severe incident. It can't be pervasive if it's only one.  I mean, when you read the cases, none of them really would give you a claim after a single touching in that location. Certainly the law is not designed to give the plaintiff a claim. The law is designed to deter harassment in the workplace, and that's why, and the employee's part in that is to report it when it occurs. In the Rebello case, the plaintiff was sexually assaulted. The coworker grabbed her breasts, and this court said that's not severe or pervasive. In the Brooks case, a superior put his hands on the plaintiff's stomach and made sexual comments to her and put his hand on her shirt and under a bra and found her breasts and prevented her means of egress, and this court said it's not severe or pervasive. So if outright sexual harassment like that, outright physical assault doesn't rise to the level of severe or pervasive harassment, it certainly didn't in this case, and it certainly didn't based on one touch of the forearm and a couple of days of sexual comments, particularly when most of that could and should have been avoided if she'd only gone to HR when it first happened. And we know, by the way, we know as to was it futile to do it. We know from the facts of this case it wasn't futile to do it. All it took was plaintiff climbing the stairs to Human Resources, Mr. Perez knew he was in trouble. He told his coworker, I'm in trouble, I might get fired, and he quit and he never came back. That's all it took. It was effective. And as to plaintiff's position that there's some weakness in the fact that he hadn't been fired before, it may be that Perez, the reason he knew he was in trouble was because he was on a final warning from the first time. He knew Celie took this seriously, and putting him on a final warning is a perfectly appropriate response to that first earlier incident. There's no law that says he needed to be fired right away just because of one incident. But isn't that all conjecture that you're saying about Mr. Perez, that he knew this and that's why he quit and he was on a final warning and that's why he quit? Excuse me. I don't think that it is conjecture because the record shows that he went to a coworker and said, I think I'm in trouble for what I said. And I think the quote was, if I get fired, I get fired. So he knew that it was an issue. He certainly left for the day when he was called in to be interviewed as part of Celie's investigation. He just decided to resign instead. He asked if he could get his two weeks of vacation, and they said no. So he just resigned immediately. He knew, obviously, what was going to happen to him. But more importantly, there's nothing... Where is the missing witness? You don't have... He quit. He's not our employee. We have no control. I don't know where he is. There's nothing in the record. You don't have any control, but I practiced law for 25 years, and just because somebody quit the company doesn't mean that you can't go to them and seek a declaration or take a deposition. That's correct. But I don't think that it's any... There's any adverse inference to be drawn from the fact that he's not a witness in this  Well, there might not be an adverse inference, but there's just no evidence. That's true. I mean, you can't really rely on him. We have not denied that what plaintiff said happened. We're not denying it. We don't need him to rebut it because we haven't denied what she said. What we've said is it doesn't rise to the level of severe or pervasive. And even if it does, it shouldn't have because she should have reported it. And let me say something about her failure to report to. This is not an employee who didn't know what she was supposed to do. She knew Sealy's policy required her to report immediately. This is an employee who's not confused or timid or anything like that. This is an employee who set out on a deliberate course of action, an intentional course of  It just wasn't the one required by the law, which is to go and report this and give the employer the opportunity to stop it. She made a deliberate choice. She made the wrong deliberate choice. She tried to go out and gather evidence. And that's not her job. It's in fact counter to her job. Your brief focuses so much on the spoliation issue, and yet you haven't mentioned it at all here. Have you changed your tune on that one? No, I haven't. I haven't changed my tune, but I do admit that it only comes into play if this court doesn't affirm the summary judgment. And so I've been spending most of my time convincing this court that the district court got it right and that it should be affirmed. Let me briefly address my opponent's arguments that we should never even get to the affirmative defense. I mean, there's there and there's simply no merit in that. The Washington Court of Appeals has four times approved the Farrer-Ellert defense. In their opening brief, You need to have an undisputed, you need to have undisputed issues of fact to get to that defense, correct? Of course. Of course. Of course. That's true. But the defense certainly applies under Washington law. There's no, the Washington Court of Appeals says it applies. There's no contrary opinion from the Washington Supreme Court. Plaintiff's opening brief is all about some sense that the defense shouldn't apply because Title VII and the WLAD have different purposes. But Seeley debunked that in our opening brief, and that plaintiff seems to have abandoned that argument. And instead, in the reply brief, plaintiff now argues that there's some kind of dispute among the Washington Courts of Appeals and cites two cases, I think Campbell and Davis, as saying that they hold actually that the defense doesn't apply. But in fact, that's just not the case. Those cases don't say anything about the Farrer and Ellert affirmative defense one way or the other. And so what this court is left with is clearly the case that the Washington Courts of Appeals have decided the issue, the defense applies. As to whether the fact that it doesn't apply in the case of a tangible employment action, there's no evidence here of any tangible employment action. There's not even any evidence that there ever was a promotion available, much less that she didn't get it, much less that she didn't get it because of anything Perez did. And the alleged quid pro quo of the trip can't be the tangible employment action because there's no evidence that plaintiff either acceded to the request for sex or suffered any consequences from refusing. That's in the Holly D. versus Caltech case. I've already talked about their attempt to excuse her non-report, but it is important to note that Sealy policy and the law require her to report and to avoid harm, not to go gathering evidence, whether it's to bolster her report or to bolster a legal claim, or as she said to a coworker, to get the supervisor fired or for use in blackmailing him. None of those are good excuses. The case law is specific that there is no exception to the reporting duty based on speculation about not being believed. And speculation is all the plaintiff had. And the facts show that it wasn't, reporting's not futile. Not only did he quit the minute she walked up the stairs and say that he knew he was in trouble, they want to make it some kind of weakness that he hadn't been fired the first time. It's not a weakness. It shows that Sealy thoroughly investigated that first incident, and they put him on a final warning. And they're not required to do more than that. They have to respond to the harassment, but they don't have to fire everybody who does it. As regards to why he wasn't more closely monitored, all I can say is the plaintiff admitted that Coatney and Coley were on the floor a lot, and that, in fact, Mr. Coatney walked by twice during the 45-minute conversation she had with Perez on November 17th. I'm not exactly sure what they expected Sealy to do in terms of monitoring Mr. Perez. Should they have hung a microphone around him and recorded every single thing that he said? They haven't said what Sealy should have done that they didn't do. Looked at those videos that she asked them to look at, maybe? They never said they wouldn't look at the videos, Your Honor. I admit, agree with you that Ms. Holliday said that she wasn't going to do it right then in that meeting, but she never said she would never look at it. But then they were never available after that. I don't recall when they were no longer available, but the point is Mr. Perez quit, and I think that at that point, Sealy was able to say that we don't have to do more of an investigation. It's done. And one last point. The plaintiff makes a big deal about, well, Sealy should have publicly denounced Perez or publicly condemned the harassment, but the cases and the regulation that they cite for that proposition do not say that. They talk about public disapproval of sexual harassment as a tool of prevention. That's the CFR on that. In other words, Sealy should say, we disapprove of harassment, which they do in their policy. And it's particularly unreasonable for them to even make that argument when plaintiff testified that she did not want more attention drawn to this situation. So I'm more than happy to address any issues that I haven't touched on already. Otherwise, I would just like to conclude by saying this. Plaintiff may have shown successfully that Mr. Perez wanted to have sex with her and that he was explicit about that at work, but the statute demands more than that for liability, and both of plaintiff's claims fail on the evidence. Sealy asks that this court affirm summary judgment. Thank you very much. Thank you, counsel. Thank you, your honors. First I wanted to correct. Sealy does have an obligation under the law to remediate. They did not do that here. The proof is in the pudding. There was a complaint. They did virtually nothing to Perez. They said, don't call women babe or baby, but they didn't give him more training. They didn't say, hey, don't retaliate against people who complained against you. There was the thing, what more could Richard Coatney have done? He walked by multiple times during a 45-minute conversation. In the record, it is undisputed that those conversations were not normal, that it was not normal to close talk a female subordinate for 45 minutes on the factory floor. What was Coatney doing? Why did he not stop and see why this was happening, especially because he was supposed to be, and admittedly, according to his own declaration, was not monitoring Perez anymore for sexual harassment issues. He stopped doing that in March 2021. I wanted to move to- What about the argument that in the November time frame, she should have reported immediately, but instead she waited, and in their view, waited to collect evidence? Excellent, your honor. I don't know which of Celi's facts I should argue against. On one hand, they argue September 2021 to November 2021, there was no hostile work environment. Perez telling her, don't tell your husband what we talk about was innocuous, according to Celi. I don't understand that. Perez touching her inappropriately, him singling her out, him telling her that he was so excited to be alone with her, all of that, according to the hostile work environment claim for Celi was innocuous. But then they blame her for waiting a few days to report in November. So either she waited too long because there was the hostile work environment didn't exist. Well, then it was only a matter of a few days and she didn't wait too long. Or this whole thing was a grooming exercise, in which case they're arguing, well, then she should have reported earlier. So that is another issue with their stance. I wanted to also note. But that you haven't quite given me a resolution to that line of logic. She should have reported earlier. Why not? She wanted, as she's testified, she wanted her job and her life back. She is a lay person. She does not have the benefit of a legal degree or advanced understanding of what the law or the policy even requires. But what she did do is when it reached a point where he was saying incredibly section sexual vulgar things, she wanted to report. And then she did not because she wanted to get that recording again. It was only a matter of days. Also, defense said that these statutes have don't have different purposes. That is false. The Washington state statute is focused on a constitutionally guaranteed civil right for people to be free of harassment. The federal statutes have none of that in it. They are focused on encouraging employers to do a better job of implementing processes so that they are protecting employees. Again, the focus is on the protection and remediation in the Colorado statutes. In the federal statutes, it's focused on the behavior of the employers. That is a very distinct thing. That has caused Courier v. Northland Services, a Washington state course. It covers independent contractors in Washington state. That isn't covered by federal law under the same thing. Lotus v. Corbis is another situation where in the state of Washington, HR can be protected against retaliation. Because in situations where HR had a duty to report wrongdoing, in federal law, that's part of their job. They can't get protected for retaliation in the same way. So there are multiple major situations in which the Washington state court, Washington state law, covers and protects individuals in the way the federal law just doesn't because they have different purposes. Let me just check with my colleagues. Do you have any more questions? No, I don't. Thank you. Anything further? All right. Thank you so much. Thank you, Your Honor. Thank you for your briefing the argument in this case. This matter is submitted.
judges: McKEOWN, OWENS, Kendall